IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

JUDY HARRIS                    *

          Plaintiff       *

        vs.                 *    CIVIL ACTION NO. MJG-13-2999

THE BANK OF DELMARVA           *

         Defendant        *

*        *        *        *        *        *        *        *        *

MEMORANDUM AND ORDER RE: SUMMARY JUDGMENT

    The Court has before it Defendant's Motion for Summary Judgment [Document 9] and the materials submitted relating thereto.  The Court has held a hearing and had the benefit of the arguments of counsel.

I.   BACKGROUND

    As discussed herein, Plaintiff Judy Harris ("Harris") was fired by her former employer, Defendant the Bank of Delmarva (the "Bank") on July 1, 2013.

    On July 19, 2013, Harris filed an Intake Questionnaire with the United States Equal Employment Opportunity Commission ("EEOC") asserting that she had been discriminated against "because of my age."  Id.  There was no need for a right-to-sue

letter,[1] so none was issued.  Harris filed the Complaint in this
Court [Document 1] on October 10, 2013.  On November 11, 2013,
the Bank filed a Motion to Dismiss [Document 3].  Harris did not
respond but filed a "First Amended Complaint" [Document 5],
which the Court accepted as the "Amended Complaint."  [Document
6].  In the Amended Complaint, Harris presents a claim against
the Bank in one Count – Illegal Discrimination Under Age
Discrimination in Employment Act of 1967.

By the instant Motion, the Bank seeks summary judgment
pursuant to Rule 56 of the Federal Rules of Civil Procedure.


II.  <u>SUMMARY JUDGMENT STANDARD</u>

A motion for summary judgment shall be granted if the
pleadings and supporting documents "show[] that there is no
genuine dispute as to any material fact and the movant is
entitled to judgment as a matter of law."  Fed. R. Civ. P.
56(a).

The well-established principles pertinent to summary
judgment motions can be distilled to a simple statement:  The
Court may look at the evidence presented in regard to a motion
for summary judgment through the non-movant's rose-colored

---

[1]   <u>See</u> <u>D'Anna v. M/A-COM, Inc.</u>, 903 F. Supp. 889, 892 n.1 (D.
Md. 1995) ("Unlike Title VII, the ADEA does not require the EEOC
to issue a right-to-sue prior to the institution of a private
suit. An ADEA plaintiff must only wait sixty days, and then may
file suit . . . .").

glasses, but must view it realistically.  After so doing, the essential question is whether a reasonable fact finder could return a verdict for the non-movant or whether the movant would, at trial, be entitled to judgment as a matter of law.  See, e.g., Celotex Corp. v. Catrett, 477 U.S. 317, 322-323 (1986); Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986); Shealy v. Winston, 929 F.2d 1009, 1012 (4th Cir. 1991).

Thus, in order "[t]o defeat a motion for summary judgment, the party opposing the motion must present evidence of specific facts from which the finder of fact could reasonably find for him or her." Mackey v. Shalala, 43 F. Supp. 2d 559, 564 (D. Md. 1999) (emphasis added).  However, "self-serving, conclusory, and uncorroborated statements are insufficient to create a genuine issue of material fact."  Int'l Waste Indus. Corp. v. Cape Envtl. Mgmt., Inc., 988 F. Supp. 2d 542, 558 n.11 (D. Md. 2013); see also Wadley v. Park at Landmark, LP, 264 F. App'x 279, 281 (4th Cir. 2008).

When evaluating a motion for summary judgment, the Court must bear in mind that the "[s]ummary judgment procedure is properly regarded not as a disfavored procedural shortcut, but rather as an integral part of the Federal Rules as a whole, which are designed 'to secure the just, speedy and inexpensive determination of every action.'"  Celotex, 477 U.S. at 327 (quoting Fed. R. Civ. P. 1).

III. <u>DISCUSSION</u>

    A.    <u>Factual Background</u>

        1.    <u>Harris's Employment with the Bank</u>

Harris began working for the Bank as a teller in 2003 when she was 56 years old.  Harris Dep. 6:20-7:9.  In 2005, she was promoted to Customer Service Representative ("CSR").  <u>Id.</u> 7:10-15.

Harris primarily worked at the Bank's East Salisbury branch.  <u>Id.</u> 7:19-21.  As a CSR, Harris was "second on the chain of command" at the branch.  <u>Id.</u> 63:1-7.  Her responsibilities included "overseeing the [tellers] to make sure that they were doings things properly."  <u>Id.</u> 11:4-7.  Harris testified at her deposition that she was "[m]ore or less" a supervisor to the tellers.  <u>Id.</u> 13:1-5.

During the relevant time, all but one of the permanent employees at the East Salisbury branch were Caucasian.  <u>Id.</u> 58:12-14.  Kay Anderson ("Anderson"), a teller, was the only African-American employee.  <u>Id.</u> 58:1-8, 15-17.

Harris and Anderson did not get along.  In Harris's 2012 Performance Appraisal, East Salisbury branch manager Timothy Boston ("Boston") rated Harris 70 out of 100 points in Working Relationships, a 19-point drop from the previous year.  <u>See</u> [Document 11-4] at 10, 12.  Boston wrote that Harris "[n]eeds

improvement on working with Kay Anderson.  They often do not get along as they should.  Works well with everyone else at Branch." Id. at 12.  As to Harris's overall performance, Boston wrote that "[t]here is work that needs to be done as a Supervisor with communication to all employees.  Sometimes there are communication issues with Kay Anderson that need to be worked on constantly."  Id.

In Anderson's 2012 Performance Appraisal, Boston rated Anderson 70 out of 100 points in Working Relationships.  Boston wrote that Anderson "[n]eeds improvement on working with Judy Harris.  They often do not get along as they should.  Works well with everyone else at Branch."  [Document 11-8] at 2.  As to Anderson's overall performance, Boston wrote that "[t]here is work that needs to be done with communication to all employees.  Sometimes there are communication issues with Judy Harris that need to be worked on constantly."  Id.


        2.   The "N Word" Incident

Occasionally, on Saturdays, Harris would fill in at the Bank's Eastern Shore Drive branch.  Harris Dep. 8:5-21.  When Harris filled in at the Eastern Shore Drive branch, a branch manager was not present, so Harris as "the CSR was the highest ranking person there."  Id. 13:6-12.

One Saturday in early 2013 – sometime between January and
Marsh – Harris was filling in at the Eastern Shore Drive branch.
Also present that day were Eastern Shore Drive branch employees
Evelyn Moore ("Moore"), Jan Hearn ("Hearn"), and Rebecca Meade
("Meade").  Id. 32:12-15.  During a conversation, Harris
referred to Anderson by using a racially derogatory term – the
"N word".  Harris Aff. ¶ 7.  Specifically, Harris admitted at
her deposition that she said Anderson "was acting like an N
word."  Harris Dep. 38:13-39:2.


### 3.   Termination of Harris's Employment

On June 13, 2013, Anderson transferred from the East
Salisbury branch to the Eastern Shore Drive branch "as her new
permanent location."  Hill Aff. ¶ 3.  Moore then reported the
comments Harris had made about Anderson earlier that year to the
Eastern Shore Drive branch manager.  Moore wrote that she did
not report the comments earlier because she "did not want to
cause trouble for [Anderson]."  [Document 9-7] at 2.  However,
after Anderson transferred out of the East Salisbury branch,
Moore "felt [she] should come forward and report this . . .
inappropriate behavior by another [Bank] employee."  Id.

The Eastern Shore Drive branch manager informed Angela Hill
("Hill"), the Bank's Director of Human Resources, who contacted
Lawrence Dernulc ("Dernulc"), the Bank's Senior Vice President

for Branch Operations.  Hill Dep. 29:16-30:1.  Hill directed Moore, Hearn, and Meade to submit written statements describing their conversation with Harris.

Moore, Hearn, and Meade submitted statements dated June 24, 2013.

Moore wrote:

> I was scheduled to work on Saturday with Jan Hearn, Becky Meade, and Judy Harris. . . .
>
> Judy came in the branch at [sic] immediately started talking about the damn . . . n_____ that worked at her branch.  I did not know who she was referring to, but I was shocked at the language that she used.
>
> Judy did not know me or my family and her use of such a nasty uncalled for racial slur was very upsetting to me.
>
> I in fact have family members and friends of the race she was talking about.
>
> In the course of the day she referred to the individual again as a n_____.

[Document 9-7] at 1-2.

Hearn wrote:

> One Saturday morning . . . Judy Harris from the East branch came to ESDB [the Eastern Shore Drive branch] to work with Evelyn Moore, Becky Meade, and myself.  During the course of the morning she referred to one of the tellers from the East Branch, Kay Anderson, as a damn nigger and we were all [shocked] . . .  Every time [Harris] said something about [Anderson] she called her a nigger.

[Document 9-8] at 1.

Meade wrote:

> Judy Harris from East Branch came in that
> morning and starting [sic] talking about she
> couldn't stand working with that "damn
> nigger" Kay Anderson.  She repeatedly kept
> referring to Kay as a nigger . . . .

[Document 9-9] at 1.

On July 1, 2013, Harris was called into a meeting with Hill
and Dernulc.  Harris Dep. 15:11-21.  She was not informed of the
subject matter of the meeting in advance.  Id. 18:19-21.  At the
meeting, Harris was told that she was being terminated from her
employment with the Bank for using the "N word" to refer to
Anderson during a conversation with other employees while at
work.  Id. 17:18-18:1; Dernulc 27:17-28:4.

Dernulc testified at his deposition that he "gave [Harris]
a choice of she could resign, she could retire, or [the Bank]
could say [it] terminated her."  Dernulc Dep. 38:4-9.  Hill and
Dernulc do not recall which option Harris chose.  Id. 39:9-19.
Later that day, Hill sent a job posting for the CSR position at
the East Salisbury branch to Bank employees, which stated that
"Judy Harris has resigned from the bank."  [Document 11-11] at
1.  During a subsequent job search, Harris told prospective
employers that she had retired and "just wanted to get back in
the work force," which she admitted was less embarrassing than
the reason the Bank gave her for her termination.  Harris Dep.
66:11-67:2.

Harris applied for unemployment benefits with the State of Maryland, Department of Licensing and Regulation, Office of Unemployment Insurance ("DLLR"), but her request was denied based upon a finding that her use of the "'N word' constitute[d] gross misconduct." [Document 9-6] at 4; see also Harris Dep. 26:14-21. Harris informed DLLR:

> I am aware that [use of the "N word" in the workplace] is against policy and it could get you discharged.
>
> I am so sorry. I met [sic] nothing by it. I should not have used that word and it is not something that I normally would say or do. I did not mean to be disrespectful to anyone or make anyone feel uncomfortable.

[Document 9-6] at 3.

Harris was 66 years old at the time of her termination. [Document 11-6] at 1. However, as disused herein, Harris has presented no evidence adequate to enable a reasonable jury to find that her age had anything whatsoever to do with her being fired.


B.   The Burden-Shifting Scheme

The Age Discrimination in Employment Act of 1967 ("ADEA"), 29 U.S.C. § 621 et seq., prohibits employers from "discharg[ing] any individual . . . because of such individual's age."  29 U.S.C. § 623(a)(1).  An employee's claims of age discrimination in violation of the ADEA are subject to the burden-shifting

scheme of McDonnell Douglas Corp. v. Green, 411 U.S. 792 (1973),

and its progeny.  See, e.g., Warch v. Ohio Cas. Ins. Co., 435

F.3d 510, 513-14 (4th Cir. 2006).[2]

Thus, Harris must present a prima facie case of age

discrimination.  Id. at 513-14.  If she does so, "the burden of

production shifts to the [Bank] 'to articulate some legitimate,

nondiscriminatory reason for [Harris]'s [termination].'"

O'Connor v. Consol. Coin Caterers Corp., 517 U.S. 308, 311

_____

[2]    The Amended Complaint states:

> [S]everal younger employees made negative
> remarks about an employee named Amanda,
> while at the workplace, and none of them
> were even reprimanded . . . . [T]here [was]
> disparate treatment between Plaintiff and
> the younger employees . . . .

Am. Compl. ¶ 10.
     However, Harris has not addressed any disparate treatment
claim in her Response to the instant Motion, and, therefore, has
abandoned it.  See Mentch v. E. Sav. Bank, FSB, 949 F. Supp.
1236, 1246-47 (D. Md. 1997).  Moreover, Harris has not presented
evidence adequate to support any disparate treatment claim.
     Harris testified at her deposition that the Amended
Complaint refers to comments that three Bank tellers made about
Amanda, another teller.  Harris stated that those tellers
complained "it seemed like [Amanda] could come in late and she
wasn't being reprimanded for being late . . . [a]nd the girls
were getting upset about it."  Harris Dep. 75:12-17, 76:6-13.
When asked if she "believe[d] that voicing this opinion about
[Amanda] being late is comparable to referring to . . . an
African-American, as a Nigger," Harris responded: "I don't
know."  Id. 76:20-77:3.  Further, when asked on the EEOC
questionnaire to "[d]escribe who was in the same or similar
position as you and how they were treated[, and o]f the persons
in the same or similar situation as you, who was treated better
than you," Harris wrote: "Not that I'm aware of."  [Document 9-
12] at 2.

(1996) (citation omitted).  "Once [the Bank] meets this burden, [Harris] must prove that [the Bank]'s proffered reason was mere pretext and that [age] was the real reason for her termination." Hawkins v. PepsiCo, Inc., 203 F.3d 274, 278 (4th Cir. 2000).

Accordingly, Harris bears the ultimate burden of proving that the Bank discriminated against her based on her age.  See, e.g., Brandford v. Shannon-Baum Signs, Inc., 519 F. App'x 817, 819 (4th Cir. 2013); Hill v. Lockheed Martin Logistics Mgmt., Inc., 354 F.3d 277, 285 (4th Cir. 2004).


C.   The Prima Facie Case

To present a prima facie case of age discrimination in the Bank's decision to terminate her employment, Harris must establish that:

> (1)   she is a member of the protected class – i.e., she is at least 40 years old;
>
> (2)   she suffered an adverse employment action;
>
> (3)   at the time of the adverse employment action,[3] she was performing her job

---

[3]   Harris would have the Court interpret the "at the time of the adverse employment action" to mean that the Bank should not, on July 1, 2013, have considered her not to be performing adequately at that time because the "N word" incident had occurred several months earlier.  The Court does not agree. Inherent in every employment termination is a decision that the employee had not been performing adequately at some time prior to the termination.  The undisputed evidence establishes that the Bank's management acted promptly upon being made aware of the incident.  Thus, Harris could not reasonably have been

> duties at a level that met the Bank's
> legitimate expectations; and

> (4) following her termination, the position
> remained open or she was replaced by a
> substantially younger individual with
> comparable qualifications.

29 U.S.C. § 631(a); <u>Warch</u>, 435 F.3d at 513-14; <u>Hill</u>, 354 F.3d at

285.

Harris has failed to present a <u>prima facie</u> case because she

cannot establish that she was, at the time of her termination,

performing her job duties at a level that met the Bank's

legitimate expectations.  Succinctly put, and as Harris

concedes, Harris's use of the "N word" in the workplace was an

adequate reason for the Bank to fire her.  In fact, Harris told

DLLR on July 25, 2013[4]:

> <u>I am aware that</u> [use of the "N word" in the
> workplace] <u>is against policy and it could</u>
> <u>get you discharged</u>.

[Document 9-6] at 3 (emphasis added).

Further, at her deposition, Harris acknowledged that use of

the "N word" in the workplace is inappropriate and could result

in an employee's termination, and that the Bank had a legitimate

expectation that a CSR would not use such language at work:

> Q.  So you would agree that use of the N
> word is something that's pretty bad?

---

considered to be performing adequately as of the time of
termination.
[4]    After initially stating that she used the "N word," not at
work, but while at the grocery store. [Document 9-6] at 2.

A.   Yes, it is. It's offensive.

. . . .

Q.   So you told Unemployment that you understood that you could be fired for using the N word in the workplace?

A.   Um-hmm.   Yes.

. . . .

Q.   Would you agree with me that it's a legitimate expectation of the bank of Delmarva for your conduct as a CSR that you won't refer to other employees using the N word?

A.   Yes.

Harris Dep. 30:21-31:2, 32:8-11, 70:18-71:1.

Harris contends that the Court, in regard to the prima facie determination, must disregard the "N word" incident, relying upon Cline v. Catholic Diocese of Toledo, 206 F.3d 651, 660-61 (6th Cir. 2000).  However, in Warch v. Ohio Casualty Insurance Co., 435 F.3d 510 (4th Cir. 2006), the U.S. Court of Appeals for the Fourth Circuit expressly "reject[ed the approach from Cline] that consideration of the employer's legitimate job expectations at the prima facie improperly allows consideration of evidence the employer would typically present in the second stage of the McDonnell Douglas framework, that is, where the employer offers the legitimate, non-discriminatory reason for

the termination."  <u>Id.</u> at 515.  The Fourth Circuit reasoned
that:

> because a plaintiff must show by a
> preponderance of the evidence that he met
> the employer's legitimate job expectations
> to prove his prima facie case, the employer
> may counter with evidence defining the
> expectations as well as evidence that the
> employee was not meeting those expectations.
> To require otherwise would turn the
> plaintiff's burden at the prima facie stage
> into a mere burden of production, making it
> "difficult to imagine a case where an
> employee could not satisfy the 'qualified'
> [or legitimate expectation] element as
> defined in <u>Cline</u>."

<u>Id.</u> at 515-16 (alteration in original) (citation omitted).

Of course, an employer's expectations cannot be "a 'sham
designed to hide the employer's discriminatory purpose.'"  <u>Id.</u>
at 518 (citation omitted)).  However, there is no evidence from
which a reasonable jury could find that the Bank's standard
prohibiting workplace use of the "N word" is a sham.  As the
Fourth Circuit has stated:

> Far more than a "mere offensive utterance,"
> the word "nigger" is pure anathema to
> African-Americans.  "Perhaps no single act
> can more quickly alter the conditions of
> employment and create an abusive working
> environment than the use of an unambiguously
> racial epithet such as 'nigger' by a
> supervisor in the presence of his
> subordinates."

Spriggs v. Diamond Auto Glass, 242 F.3d 179, 185 (4th Cir. 2001)

(citation omitted); see also Daso v. Grafton Sch., Inc., 181 F.

Supp. 2d 485, 493 (D. Md. 2002).

The Court finds that no reasonable jury could find that

Harris was meeting the Bank's legitimate expectations by virtue

of her use of the "N word" to refer to a subordinate during a

workplace conversation.[5]  Accordingly, Harris has failed to

present a prima facie case of age discrimination.  Moreover, as

discussed below, even if the Court were to assume that Harris

had presented a prima facie case, she has failed to present

evidence adequate to meet her ultimate burden of proof.

---

[5]   Harris contends that her Performance Appraisals from 2007
through 2012, which rated her job performance as "Very Good,"
prove that she was meeting the Bank's legitimate expectations.
See [Document 11-4].   However, Harris fails to acknowledge that
her 2012 Performance Appraisal was prepared at the end of 2012
and reviewed with her on January 4, 2013, before she used the "N
word" at work.   See id. at 12.
     Harris also contends that there is no causal connection
between her use of the "N word" at work in early 2013 and her
termination in July 2013.   She relies upon Pascual v. Lowe's
Home Centers, Inc., 193 F. App'x 229 (4th Cir. 2006), in which
the Fourth Circuit concluded that "at least three to four months
separated the termination of Pascual's employment and the
claimed protected activities[, which] is too long to establish a
causal connection by temporal proximity alone."   Id. at 233.
However, Pascual was a Title VII retaliation case, and a prima
facie case of age discrimination under the ADEA does not require
proof of a causal connection.
     Harris's argument "that her one crude remark six months
earlier [could not have] anything to do with her [job]
performance six months later," [Document 11] at 11, overlooks
the fact that Bank management was not made aware of Harris's use
of the "N word" at work until Moore informed a branch manager at
the end of June 2013 and that Harris subsequently was terminated
some two weeks thereafter.   Hill Dep. 27:2-14.

D.   Articulation of Legitimate Non-Discriminatory Reason

The Bank has articulated a legitimate non-discriminatory reason for Harris's termination – use of the "N word" in the workplace to refer to another employee.

The Bank's "burden at this stage 'is one of production, not persuasion; it can involve no credibility assessment.'"  Warch, 435 F.3d at 514 (quoting Reeves v. Sanderson Plumbing Prods., Inc. 530 U.S. 133, 142 (2000) (internal quotation marks omitted)).

Hill testified at her deposition that she recommended that Dernulc terminate Harris because "[Harris] said [the "N word"] more than once in front of people she hardly knew, and to subordinates at that time. . . . And it's not professional. . . . [I]t's gross misconduct."  Hill Dep. 37:4-14.  Dernulc, the primary decision maker with ultimate authority over the decision to terminate Harris, testified that "using the 'N' word . . . cannot be tolerated in the workplace."  Dernulc Dep. 17:20-18:1, 26:8-13.  He was concerned that Harris's use of the "N word" "violated [the Bank's] policy regarding race, gender, sex."  Id. 25:11-16.

If Harris had presented a prima facie case, she would have to present evidence that the Bank's articulated reason was pretextual to carry her ultimate burden of proof.

E.   Pretext for Discrimination

"The burden to show pretext and discriminatory intent is
higher on an age discrimination claim than it is on a race-based
discrimination claim.   Collins v. Baltimore City Bd. of Sch.
Comm'rs, No. CIV.A. MJG-09-2020, 2011 WL 5877213, at *5 (D. Md.
Nov. 22, 2011).   In an ADEA case, "the plaintiff retains the
burden of persuasion to establish that age was the 'but-for'
cause of the employer's adverse action."   Gross v. FBL Fin.
Servs., Inc., 557 U.S. 167, 177 (2009) (emphasis added).

1.   Harris's Contentions

In her Response to the instant Motion, Harris presents five
meritless contentions to try to support her position that the
Bank's proffered reason for her termination was a pretext for
age discrimination.   See [Document 11] at 14-21.   The Court
shall address each of these in turn.

- "Defendant changed their [sic] story twice as to
  the basis for Plaintiff's termination." [Document
  11] at 14.

The assertion that there were "changed stories" is based
upon statements of the Bank to the effect that Harris had
resigned or retired, without expressly stating that Harris had
been fired.   This "sugar coating" was for the benefit of Harris

and was not, in any way, a variation regarding the reason for Harris's termination.

In fact, Harris herself told prospective employers that she had retired.  When asked at her deposition if she "preferred people saying that you retired as opposed to you were fired for using the N word," Harris responded "Yes."  Harris Dep. 79:19-21, 80:4-7.

There is no evidence that the Bank changed its position regarding the reason for Harris's termination.

- "Defendant is a thoroughly racist organization in its employment practices . . . ."  [Document 11] at 16.

As "explained" by counsel for Harris at the hearing, his position is that the Bank, being a purportedly racist organization, would not have terminated an employee for using the "N word" to refer to an African-American and that, therefore, Harris must have fired her because of her age.  There is no evidence that, rationally viewed, supports counsel's unwarranted accusation that the Bank was racist.

- "The[re are] statistics and inconsistent stories about those over 60 . . . ." [Document 11] at 18.

Harris's counsel's purported use of "statistics" is utterly baseless.[6]  The data relied upon by Harris's counsel merely reflects that, in a given time, the percentage of employees over 60 years old leaving employment with the Bank is higher than the percentage of employees under 60 years of age who leave employment.  The data does not indicate those employees who retired voluntarily and those who may have been terminated.  See [Documents 11-5, 11-6, 11-7].  Moreover, the data base includes only 13 employees over 60 years old.  [Document 11-6] at 1-2.  It is hardly meaningful that, considering the normal health effects of aging (including mortality) and desires to retire, a higher percentage of people over 60 years old leaves the workforce than do employees in the 20 to 60 year-old age range.

Counsel's reliance upon so-called "inconsistent stories" is completely baseless.  As stated at the hearing on the instant Motion, Harris seeks to rely on purportedly "inconsistent" statements regarding George Cramer and Nancy Elliott.

---

[6]     "[W]hile properly admitted statistical evidence may support an age discrimination claim, courts must remember that statistical evidence is 'inherently malleable' and must therefore be scrutinized carefully, especially if drawn from samples too small to have probative value, or unsupported by expert testimony."  Malina v. Baltimore Gas & Elec. Co., 18 F. Supp. 2d 596, 604 (D. Md. 1998) (emphasis added).

As to George Cramer, Harris stated in her Response to the instant Motion:

> in one sworn company statement he "resigned due to illness", and in another sworn statement he left because "He moved to Florida."

[Document 11] at 18-19.

The two statements are not at all inconsistent.  The so-called "inconsistent" story, according to Harris's counsel, is the statement from Hill at her deposition that "[George Cramer] moved to Florida."  Hill Dep. 64:14-18.  However, Hill clarified in her affidavit that "Mr. Cramer informed the Bank that he was resigning . . . after less than six months' employment with the Bank.  He told me he was moving to Florida.  I was later told . . . that he left the Bank because he was ill with Parkinson's disease."  Hill Aff. ¶ 3.

Moreover, the evidence includes a record of the Bank that states "5/16/2013 ([George Cramer] resigned due to illness)." [Document 11-6] at 1.  The evidence also includes a letter from Mr. Cramer that says "I am resigning from The Bank of Delmarva. . . . I can say that this bank and all of its employees . . . is one of the best group [sic] of people I have ever worked with." [Document 13-6].

As to Nancy Elliott, Harris stated in her Response:

> Although the official reason given by the company [for the end of Ms. Elliott's

> employment] was "she retired."  In fact she
> was forced out of the company by Angela Hill
> because she had developed a sickness and
> Hill did not feel she was up to the job.

[Document 11] at 19.

In her affidavit, <u>submitted by Harris</u>, Ms. Elliott stated:

> After two weeks [back at work following back
> surgery] I was about to give notice to
> retire, then I only worked two more weeks,
> if Hill had acted differently I might have
> wanted to stay.

Elliott Aff. ¶ 6.  The evidence also includes a letter from Ms.

Elliott dated August 15, 2011, which states that "[a]fter 25

years with the bank, I have decided to retire." [Document 13-

5].

The purported inconsistent story, according to Harris's

counsel, is the Bank saying that Elliott retired, when Elliott

stated in her affidavit that "if Hill had acted differently,"

she might have not retired as early.  There is no inconsistency.

No reasonable jury could conclude, based on the evidence

presented, that there were "inconsistent stories" in the Bank's

explanations for Mr. Cramer's and Ms. Elliot's leaving their

employment with the Bank.

- "The distance in time between the alleged incident
  and the termination makes the proffered reason,
  not believable." [Document 11] at 19.

The evidence establishes that management of the Bank was

not informed about the "N word" incident until June 2013, that

employees submitted statements regarding the incident on or
about June 24, 2013, and that Harris was terminated on July 1,
2013.  There is no basis whatsoever for a contention that there
was any "delay" by the Bank that could affect the credibility of
the Bank's articulated reason for firing Harris, a reason that,
indeed, Harris admits existed.


- "The events shortly before and shortly after
  Plaintiff's termination show proof of pretext."
  [Document 11] at 20.

The "events" referred to in Harris's Response include the
alleged inconsistent statements discussed above and a meeting
that Harris purportedly had at the Bank with Boston, the former
manager at the East Salisbury branch, on June 28, 2014.  Harris
says that at this meeting, Boston told her to "watch your back."
Harris Aff. ¶ 5.

The undisputed evidence establishes that Boston was no
longer working for the Bank on that date and could not have had
the purported meeting.  See Boston Aff. ¶¶ 4-5.  However, even
if Harris's story were true, a warning on June 28 to "watch your
back" is no indicator of pretext as to the reason for firing
Harris.  Indeed, the purported warning – if actually given – was
given shortly after three employees submitted statements to Bank
management regarding the "N word" incident for which Harris was

22

fired and, thus, presumably, Harris had good reason to "watch [her] back."

## 2.   <u>Harris Acknowledged the Lack of Evidence</u>

At her deposition, Harris acknowledged that she could not identify any facts, circumstances, or documents, to support her contention that was terminated because of her age:

> Q.   Did you ever during your employment with Bank of Delmarva complain that you were being discriminated against because of your age?
>
> A.   No.
>
> Q.   And was there any action taken by the bank other than your termination which you contend was related to your age?
>
> A.   I don't know.
>
> Q.   So sitting here today you don't recall any other action?
>
> A.   Right.
>
> . . . .
>
> Q.   Okay.  Now you haven't told me, my question to you was to state any facts or circumstances on which you're going to rely in contending that you were discriminated on because of your age by the bank.  What you've told me is that you wanted to continue to work and you liked working with your customers but you haven't really told me anything about why you think you were terminated because of your age.  Are

> there any facts or circumstances that
> you can tell me about?
>
> A.    No.
>
> Q.    Excuse me?
>
> A.    No.
>
> Q.    Okay.   And do you have any documents
> that would support your belief that
> you were terminated because of your
> age?
>
> A.    No.

Harris Dep. 67:3-13, 68:14-69:5.

The Court concludes that Harris has not presented evidence adequate to permit a reasonable jury to find that the Bank's decision to terminate her on July 1, 2013 for her use of the "N word" in the workplace earlier that year was a cause, let alone the "but for" cause, of her termination.


IV.   CONCLUSION

For the foregoing reasons:

1.    Defendant's Motion for Summary Judgment [Document 9] is GRANTED.

2.    Defendant's Motion for Sanctions [Document 10] remains under consideration.


SO ORDERED, on Tuesday, February 3, 2015.

                              /s/_____
                         Marvin J. Garbis
                         United States District Judge

24